UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. _____

South Florida Helicopter and Charter Tours LLC,

    Plaintiff,

v.

Jamaica Defence Force,

    Defendant.
_____/

## **COMPLAINT**

South Florida Helicopter and Charter Tours LLC ( South Florida Helicopter") hereby files its Complaint against the Jamaica Defence Force (the  JDF"), and in support thereof states as follows:

### INTRODUCTION

1. South Florida Helicopter won a bid to refurbish two helicopters for JDF, believing that a relatively straightforward job would add to its established portfolio of helicopter sales and related services in the Caribbean region. Instead, South Florida Helicopter has been the subject of a campaign of unreasonable demands and disparagement. This lawsuit relates to the cost overruns, delays, and erratic behavior by JDF. The Court should grant the relief requested herein for the following reasons:

- Jurisdiction and venue are proper over JDF because it is a foreign state, as defined by the Foreign Sovereign Immunities Act (the "FSIA"), and this action is based on JDF's commercial activity in Miami-Dade County.

- JDF prevented South Florida Helicopter from finishing on-time and on-budget by changing the specifications for the helicopters and failing to meet its delivery

obligations. The delays caused South Florida Helicopter to incur significant costs as well as cost overruns that JDF has refused to reimburse.

2. For these reasons and those stated below, South Florida Helicopter seeks relief from this Court.

**PARTIES, JURISDICTION, AND VENUE**

3. Plaintiff South Florida Helicopter Charter and Tours LLC is a limited liability company organized and existing in the State of Nevada. Its registered office is located at 1005 Terminal Way, Suite 124, Reno, NV 89502.

4. Defendant Jamaica Defence Force is within the Ministry of National Security of Jamaica. The JDF is not a separate legal person. For the purposes of 28 U.S.C. 1603(a), the JDF is therefore a "foreign state."

5. This is a nonjury civil action against a foreign state, giving this Court original jurisdiction over JDF.

6. There is personal jurisdiction over JDF because it purposefully availed itself of the privilege of conducting activities in Florida by contracting with South Florida Helicopters for the refurbishment, inspection, viewing, flight testing, and delivery of helicopters in Miami-Dade County. JDF's failure to give reasonable instructions led to the damages suffered by the plaintiff in Miami-Dade County. JDF officials traveled to Miami-Dade County as part of the execution of the Agreement and contracted with South Florida Helicopter, which listed its mailing address in the Agreement as being in Miami-Dade County. Exercise of this Court's jurisdiction over JDF would thus be reasonable and just. South Florida Helicopter will also effectuate service on JDF in accordance with 28 USC 1608(a), giving this Court jurisdiction under 28 USC 1330(b).

7. Venue is proper in Miami-Dade County because a substantial part of the events or omissions giving rise to the claim occurred here. As explained below, the Agreement called for

delivery of the helicopters in Miami-Dade County; refurbishment of the helicopters was carried out in Miami-Dade County, as well as Broward County and Palm Beach County; the helicopters and parts were stored in Miami-Dade County; and JDF officials came to Miami-Dade County to inspect, view, and test fly the helicopters. South Florida Helicopter has also sourced parts and equipment in Miami-Dade County for JDF, including from JDF's required suppliers: Africair and Tropical Aviation Distributors.

## BACKGROUND

8. South Florida Helicopter is part of a family of companies that operate in the sale of helicopters, parts, and related consultancy services.

### *South Florida Helicopter enters into the Agreement*

9. In 2018, South Florida Helicopter responded to a request for proposal issued by JDF. The request sought two helicopters, each a Bell 206 B3 Jet Ranger (a "Jet Ranger"). Bell Textron Inc. ("Bell") is the manufacturer of the Jet Ranger.

10. Bell initially developed the predecessor of the Jet Ranger to compete for a contract from the United States Navy in 1960. After failing to win the bid, Bell targeted the commercial market, redesigning the aircraft to make it more aesthetically pleasing and adding various features, such as a larger cargo hold and different tail design. The first sales were for non-military buyers, although there were also sales to the United States Navy and Army. The Jet Ranger III, which is the model requested by the JDF, is quite popular. In the commercial market, the Jet Ranger is one of the most recognized and successful helicopter models.

11. South Florida Helicopter competed with several parties for JDF's business through what was thought to be a fair process. Upon information and belief, South Florida Helicopter came to learn that the other bidders were supposedly HeliTaxi, the representative for Bell in Jamaica owned by Andrew Bogle, and Ecolift, a Bell dealer in Puerto Rico.

12. South Florida Helicopter was successful in its bid, and it entered into negotiations with JDF. Those negotiations led to a contract (the "Agreement"), executed by the parties on December 14, 2018. The Agreement is "by and between the Government of Jamaica acting through the Jamaica Defence Force" and South Florida Helicopter. The Agreement called for an initial payment of USD 1,295,000 into escrow, after which South Florida Helicopter would be required to acquire and outfit the helicopters as mandated in Appendices A and B.

13. The appendices outlined a number of parts and equipment that South Florida Helicopter had to procure and install. All of these parts are generally available in the market—none of them are only available to military buyers.

14. The Agreement called for the helicopters and logbooks to be delivered at Miami Executive Airport or Miami Opa Locka Airport, with Helicopter 1 between December 27, 2018, and February 20, 2019, and Helicopter 2 between February 25, 2019, and April 20, 2019. JDF retained the right to conduct a test flight in Florida prior to taking delivery. The parties made clear that the Agreement did not concern the sale of items classified as "US Munitions List" and had to exported without a license under the United States Department of Commerce License Exception NLR. The acronym "NLR" means no "No License Required," and it is a shipment recognition used by the Department of Commerce. Most exports from the United States do not require a license.

15. The Agreement is governed by the "Laws of Jamaica" and provides that, "[i]n the event any is filed in relation to this Agreement, the unsuccessful party in the action shall party to the successful party a reasonable sum for the successful party's attorney's fees."

*South Florida Helicopter Starts the Works*

16. Helicopter refurbishment is a complex process, especially the refurbishment requested by JDF. Different locations provide distinct services. Painting might be in one location while parts may be in another. Although Miami-Dade County was the focus of the refurbishment efforts, South Florida Helicopter needed to fly the helicopters to other locations, incurring costs for pilots, insurance, and handling. These costs increase on an annual basis, and in 2019, they were running around USD 7,000 per month.

17. South Florida Helicopter began to perform under the Agreement. It procured the required pieces and installed them into Helicopter 1. South Florida Helicopter provided weekly updates to JDF, often speaking with its client about twice a week whenever possible. The updates included pictures and detailed descriptions of the progress.

18. JDF was so impressed and pleased with the work that the parties agreed to an addendum to the Agreement (the "Addendum") that extended the delivery dates and modified the payment terms.

*JDF Begins to Act Erratically*

19. As South Florida Helicopter approached the completion of Helicopter 1, it began to receive requests from JDF to redesign the cockpit. These requests began in October or November 2019.

20. JDF wanted to change the avionics with different instruments. This is not a simple process. JDF was asking for things like a second Garmin, rotating the screens on the cockpit, and new instruments with completely different screen sizes. South Florida Helicopter would have to engage an engineer to redesign the internal aspects of the cockpit and the new layout. Then South Florida Helicopter would have to purchase the instruments and install them as redesigned.

Not only would this increase costs, but it would add at least six weeks or more to the refurbishment process.

21. South Florida Helicopter wanted to make its client happy, so it agreed to make the changes by providing the new quote with the requested layout and description of the resulting delays. It told JDF that this would increase the costs and stop work on both helicopters. JDF did not object.

22. The redesign would also require South Florida Helicopter to keep paying insurance and storage costs as it waited for quotes from the manufacturers of the various instruments requested.

23. Little did it know, but around the same time, JDF was actively communicating with Bell, disparaging South Florida Helicopter's performance. JDF had not complained about anything. An affiliate of South Florida Helicopter, ISS Aviation Inc. ("ISS"), had a Bell distributorship for Guyana, Surinam, and French Guiana. Bell would go on to publicly terminate the distributorship, while privately wanting to renew it. Bell then selected Africair, one of the companies JDF would later instruct South Florida Helicopter to deal with. South Florida Helicopter would not learn about this misconduct by JDF for years.

24. South Florida Helicopter got the quotes and the new layout, which it sent to JDF. For about two to three months, there was no response. The delay was strange. South Florida Helicopter had frequently communicated by telephone, but now JDF did not return calls. With no response, South Florida Helicopter had to cancel the delivery of the new engine for Helicopter 2, and it lost its slot for installation of the avionics, the new engine, air-conditioning, and other components, further delaying completion.

25. In January 2020, the balance of the funds owed on both helicopters was released to South Florida Helicopter. This unexpected development led South Florida Helicopter to believe that JDF no longer wanted the redesign, so South Florida Helicopter made plans to deliver Helicopter 1 and continue with the original layout for Helicopter 2.

***JDF Changes the Delivery Terms and Complicates the Process***

26. The Agreement called for delivery in Miami-Dade County. As stipulated in the Agreement, the helicopters were not for military use. These were civilian helicopters, and JDF had to provide pilots with a civilian license capable of securing insurance to take delivery in the United States. JDF could not meet this requirement. South Florida Helicopter thus had to deliver Helicopter 1 by flying it from Miami-Dade County to Jamaica, through the Bahamas, Turks and Caicos, Haiti, and then Jamaica. Each of these stops required filing a flight plan that denoted the license as being civilian.

27. The process also increased the costs incurred by South Florida Helicopter. There was the USD 7,000 per month from the delays in 2019. Now, it had to purchase fuel, pay for any fees charged by the various airports, and continue paying the costs of insurance and other ferrying costs.

28. South Florida Helicopter was eager to deliver Helicopter 1, so it undertook the delivery process, never once agreeing to bring Helicopter 1 at no charge to JDF.

29. In January 2020, JDF took delivery of Helicopter 1 in Jamaica. A director of South Florida Helicopter was anticipating to meet with JDF officials, but Colonel Brian Lundy cancelled the meeting after meeting Helicopter 1 upon arrival at the JDF airbase in Kingston.

*JDF Actively Undermines the Performance of the Agreement*

30. A few weeks later, a director of South Florida Helicopter visited JDF's facility to bring a part that JDF had requested as well as follow up on the operations, any warranty issues, and performance of Helicopter 1. To his surprise, he saw JDF mechanics disassembling Helicopter 1. This was shocking. South Florida Helicopter had just flown Helicopter 1 for hours, crossing the ocean numerous times between Florida and Jamaica.

31. The same director saw Mr. Bogle trying to hide in a corner and Bell staff overseeing and providing JDF with support for a different helicopter.

32. Then Captain C. T. Weise began to make unreasonable demands, such as requiring South Florida Helicopter to replace the Bell 206 it was refurbishing with a Bell 505. Captain Weise threatened to interfere with the Bell dealership that an affiliate of South Florida Helicopter had in Suriname, Guyana, and French Guiana. This occurred after JDF refused to pay for the additional costs that it caused with the delays for the new quote and layout. When it was obvious South Florida Helicopter would not budge until the additional costs and expenses are paid.

33. The whole scenario was weird, but South Florida Helicopter decided to push ahead with performing under the Agreement.

34. After delivering Helicopter 1 in Jamaica, South Florida Helicopter notified the Federal Aviation Administration (the "FAA") that it was de-registering the aircraft from the FAA civilian registry since the helicopter was a civilian helicopter delivered to the JDF. From that point forward, JDF could register the helicopter as it wanted.

### *South Florida Helicopter Tries to Forge Ahead*

35. South Florida Helicopter had every reason to believe that JDF would continue to honor the terms of the Agreement. It also believed the redesign to be an issue in the past. After all, it had just delivered Helicopter 1 without the cockpit redesign. JDF had other ideas.

36. South Florida Helicopter kept sending frequent updates, but there was no response. There were also no complaints about Helicopter 1, other than the request for a few parts that South Florida Helicopter honored at no additional charge. There were no other complaints about the quality of the work performed.

37. The covid-19 pandemic set in, causing prices and schedules to go haywire. South Florida Helicopter dutifully continued with its work on Helicopter 2.

38. JDF could have enabled South Florida Helicopter to complete the works, by paying for the unnecessary charges related to the redesign request (and delay) and the laborious delivery process. Instead, JDF contacted South Florida Helicopter on numerous occasions, seeking to use the budget allocated to the Agreement for other purposes. JDF essentially asked South Florida Helicopter to act as a procurement agent (at no additional cost), finding parts for other helicopters and other aircraft, including courier services to support grounded aircraft.

39. Wanting to maintain a strong client relationship, South Florida Helicopter located the parts from suppliers in Miami Dade County and sent them to Jamaica.

40. But it needed to recoup the excess costs for the delay and delivery of Helicopter 1. There were the months of storage and insurance costs, and the expense of flying the helicopter to Jamaica. A director of South Florida Helicopter scheduled a meeting and flew to Jamaica in July 2020 to speak personally with JDF about the overall project.

41. For five days, JDF made South Florida Helicopter's director hang out at the hotel and wait. Finally, someone from maintenance at JDF called to inform that there would be no meeting.

42. South Florida Helicopter kept going, dealing as best as it could with the supply chain issues caused by the pandemic and the absence of any feedback from JDF. As South Florida Helicopter approached the conclusion of Helicopter 2 according to the original specifications, JDF wanted to visit.

43. In August 2020, JDF came to Miami-Dade County to inspect the progress on Helicopter 2. There was no mention of compensating South Florida Helicopter for the earlier delays and increased costs. JDF was trying to ignore the issue.

44. This was too much. South Florida Helicopter had already incurred significant costs from the initial redesign request due to the delays, impacted schedules, and more. Now, it faced a recalcitrant client that had no intention of paying for the additional costs it had caused.

45. South Florida Helicopter duly reported on the delays and the resulting costs. On September 21, 2020, it sent an overview to Major Cooper and Captain Weise, describing the cause of the delay (JDF's demand for a different cockpit layout) and the impact on the project. This included missed slots for repair and disposal, monthly carrying costs, additional carrying costs, and ferry flight costs. South Florida Helicopter sent copies of proof of payment and the interactions with suppliers regarding delays. JDF was unmoved.

46. South Florida Helicopter began to suspect that something else was a foot. It checked with industry sources who confirmed that Mr. Bogle and Ecolift were allegedly meddling with South Florida Helicopter's relationship with JDF. It also learned that Tropicair and Africair allegedly wanted to damage South Florida Helicopter's reputation. This explained

JDF's erratic conduct and could explain Mr. Bogle's presence during the disassembly of Helicopter 1. South Florida Helicopter came to believe that JDF had no intention of paying the costs and other expenses it had forced South Florida Helicopter to incur with the new design quote and layout resulting in delays.

47. JDF continued with its threats to damage South Florida Helicopter's business relationships. On December 9, 2020, Captain Weise wrote that it "will also be raising the matter with Bell[.]" The only reasonable interpretation is that JDF wished to harm the relationship between Bell and South Florida Helicopter. After all, Bell had nothing to do with the Agreement.

48. On February 8, 2021, Bell announced the sale of six Bell 505s to JDF. There is no question that JDF had the funds to tender the additional costs for the disruption caused by their actions to interrupt the work with their requests for a new quote complete with new cockpit layout redesign and associated costs. JDF was just refusing to pay and expecting South Florida Helicopter to foot the bill.

49. Even when JDF officials claimed to cooperate, their actions were more likely to force additional costs on South Florida Helicopter. For example, Colonel Murphy Pryce would schedule a discussion via Zoom to listen to the issues and the costs South Florida Helicopter was incurring. He would express openness to taking Helicopter 2 "as is," or paying the pending costs, and covering the costs with associated expenses to complete Helicopter 2 and flying it to Jamaica. This would keep South Florida Helicopter from reselling Helicopter 2 in hopes of being able to deliver it JDF. Then weeks later, Col. Pryce would change his mind, reverting to the prior, unreasonable position.

50. South Florida Helicopter wanted to prioritize an amicable resolution. On March 25, 2021, South Florida Helicopter wrote to JDF stating some of the losses incurred as a result of JDF's delay. JDF continued to ignore the issue.

51. Under the Agreement, the next step was mediation. On April 25, 2022, JDF and South Florida Helicopter pursued mediation pursuant to Section 10 of the Agreement. The parties began the process of selecting a mediator and arranging for mediation.

52. During this time, on May 25, 2022, South Florida Helicopter notified JDF that South Florida Helicopter would discontinue insurance on the second helicopter. JDF still did not tender payment for the additional expenses, propose a solution, or offer to reimburse South Florida Helicopter for the years of losses and additional expenses.

53. The parties attempted to mediate their disputes on August 10, 2022, but the result was an impasse. South Florida Helicopter offered to participate in another session, but JDF did not respond.

54. The silence as to Helicopter 2 continued. For several years, Helicopter 2 continued to sit in storage and lose its value while still having to be maintained and supported, incurring additional costs in Miami Dade County. This delay was costly to South Florida Helicopter and presented it with an impossible choice. South Florida Helicopter had to keep Helicopter 2 in storage, but it was also justifiably concerned that a failure to maintain insurance during forecasted active hurricane periods would lead to a total loss of the helicopter. Although JDF would be responsible for the loss, it would destroy the asset and South Florida Helicopter's ability to resell the helicopter and recover its costs.

55. Not only was it unable to finish and deliver Helicopter 2, and collect the additional costs due, but now it had to pay for storage, insurance, maintenance and other carrying

costs of an incomplete helicopter nearing completion. These costs reached about $10,000 per month, as well as other damages for suspending other business operations and projects due to the JDF's deliberate actions.

56. This delay in finishing Helicopter 2 lasted from 2020 to 2024, or almost four years. South Florida Helicopter incurred hundreds of thousands of dollars in additional costs and expenses. Finally, South Florida Helicopter was forced to cover its losses.

57. JDF had not been paid for the additional costs based on its delays and unreasonable demands, which gave South Florida Helicopter a lien on the goods or the right to retain and then resell the second helicopter. The title had not passed to JDF, giving South Florida Helicopter the right to withhold delivery. South Florida Helicopter did not waive any of its rights as an unpaid seller.

58. South Florida Helicopter found another purchaser and sold Helicopter 2.

59. At this point, South Florida Helicopter had suffered substantial losses related to the refurbishment of Helicopter 2.

***JDF Intentionally Disparages South Florida Helicopter***

60. JDF was not content with the losses it caused. JDF and others began a campaign to disparage South Florida Helicopter and its family of companies.

61. South Florida Helicopter and its related companies started experiencing unusual shunning by potential clients, suppliers, and others in the market. Fraudulent and misleading calls and emails flooded the lines and inboxes. The interference was so intense that South Florida Helicopter and other affiliates had to suspend operations. There have even been personal safety and security concerns for the directors and management of South Florida Helicopter. Strange people reach out from questionable and unverified sources asking about buying the helicopter

and retrofitting it, as well as instances of individuals driving around and taking photographs of the facilities.

62. All conditions precedent to the relief demanded herein have occurred or have otherwise been waived or excused.

## Count I
## Breach of Contract

63. South Florida Helicopters repeats and realleges each and every allegation set forth in paragraphs 1 through 62, as though fully set forth herein.

64. South Florida Helicopters entered a fully binding agreement with JDF. The essential contract terms were clear enough that the parties could understand what each was required to do.

65. The parties agreed to the essential terms of the Agreement and to give each other something of value. South Florida Helicopters agreed to acquire, equip and sell two helicopters, which was to its detriment. It stored Helicopter 2 despite JDF changing the specifications, stopping the works, and refusing to provide reasonable instructions. South Florida Helicopter had to pay for insurance, storage costs, and other expenses. This was also to South Florida Helicopter's detriment.

66. JDF breached the Agreement when it refused to provide instructions and pay for the additional expenses caused by the requested redesign of the cockpits of both helicopters, requested quotes that led to interruption of the refurbishment work, and ultimately a work stoppage.

67. JDF also breached the Agreement by failing to take delivery of Helicopter 1 in Miami-Dade County then refusing to pay for the costs of delivery in Jamaica.

68. Delivery of both helicopters was delayed through the fault of JDF. Because of the delay, South Florida Helicopter could not finish Helicopter 2, which was at the risk of JDF as regards any loss that might not have occurred but for the delay.

69. South Florida Helicopter did all, or substantially all, of the essential things that the Agreement required it to do. JDF failed to carry out its obligation to tender payment for the additional costs it caused South Florida Helicopter, or pay for the losses caused by its failures. This became deliberate to undermine and interrupt the business operations of South Florida Helicopter, its U.S. affiliates, and its projects in order to cause financial losses and financial hardships in the U.S.

70. JDF's breaches have resulted in substantial financial harm to South Florida Helicopter. It has suffered damages from the storage, insurance, and additional costs of additional services along with support and other related expenses, all beyond the Agreement's specifications.

71. Based on the foregoing, South Florida Helicopter has suffered pecuniary harm in an amount to be established at trial.

Wherefore, South Florida Helicopter respectfully requests that this Court enter judgment granting South Florida Helicopter damages, pre- and post-judgment interest, attorneys' fees, taxable costs, and any other relief the Court deems proper.

**Count II**
**Declaratory Relief**
**(28 U.S.C. § 2201)**

72. South Florida Helicopter repeats and realleges each and every allegation set forth in paragraphs 1 through 62, as though fully set forth herein.

73. There is currently a case or controversy regarding the terms of the Agreement.

74. South Florida Helicopter and JDF are interested parties as to the terms of the Agreement.

Wherefore, South Florida Helicopter respectfully requests this this Court enter an order that it has not breached the Agreement, award South Florida its attorneys' fees as mandated by the Agreement and its taxable costs, and grant any other relief that the Court deems proper.

Respectfully submitted,

Rodney Quinn Smith II
GST LLP
78 SW 7th Street, Suite 500
Miami, FL 33130
(O) 305-856-7723
(F) 305-856-7724
Email: quinn.smith@gstllp.com

By: _/s/_____
Rodney Quinn Smith II
FBN: 59523